**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------

RIVERKEEPER, INC.,
        Plaintiff,

v.

ROYAL COACH LINES, LLC and ROYAL
COACH LINES, INC.,
        Defendants.

---------------------------------------------------------------------

Case No.  24-1234

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND CIVIL
PENALTIES**

(Federal Water Pollution Control Act, 33
U.S.C. §§ 1251 to 1387)

JURY DEMAND

Plaintiff Riverkeeper, Inc., by and through its counsel, hereby alleges:

**I.**

**INTRODUCTION**

1.      This is a civil suit brought under the Federal Water Pollution Control Act, 33

U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or "the Act"), to

address and abate Defendants' ongoing and continuous violations of the Act pursuant to the

Act's citizen suit enforcement provisions at CWA Section 505, 33 U.S.C. § 1365.

2.      Defendants discharge polluted stormwater runoff from their vehicle and

equipment maintenance and storage facilities, located in Westchester County, NY (collectively

referred to as the "Facilities") into waters of the United States without authorization, in violation

of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and have failed to obtain

coverage under and comply with the conditions of individual State Pollutant Discharge

Elimination System ("SPDES") permits or the New York State Department of Environmental

Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with

Industrial Activity, Permit No. GP-0-23-001 (March 8, 2023),

https://dec.ny.gov/docs/water_pdf/gp023001final03082023.pdf ("General Permit"), in violation of CWA Sections 402(p)(3)(A), and 402(p)(4)(A), 33 U.S.C. §§ 1342(p)(3)(A) and (p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3. Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into the New York Harbor, Long Island Sound, and other receiving waters in this District. The State of New York has assessed 62% of New York State's 87,526 miles of rivers and streams, designating 9% of those miles as impaired. The State of New York has also designated 20% of its assessed New York State lake and reservoir acres, 62% of its assessed estuary waters, and the state's Great Lakes shoreline as impaired. For the overwhelming majority of waterbodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment. Under the Clean Water Act, "impaired" means not meeting water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation. In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.

4. Defendants' stormwater discharges contribute to this endemic stormwater pollution problem. Defendants engage in industrial activities such as vehicle and equipment maintenance and storage, and vehicle traffic in and out of the Facilities. As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby surface waters. Contaminated stormwater discharges such as those from the Facilities can and must be controlled to the fullest extent required by law in order to allow these

waterbodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6. On December 21, 2023, Riverkeeper, Inc. ("Riverkeeper") provided notice of Defendants' violations of the Act and of its intention to file suit against Royal Coach Lines, LLC and Royal Coach Lines, Inc. to the Defendants; the Defendants' registered agent; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3 (the "Notice Letter"). A true and correct copy of Riverkeeper's Notice Letter is attached as Exhibit A and is incorporated herein by reference.

7. More than sixty days have passed since the notice letter was served on Defendants and the state and federal agencies. Riverkeeper has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

8. Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

9. This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

10.     Venue is proper in the United States District Court for the Southern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

11.     Plaintiff RIVERKEEPER, INC. ("Riverkeeper") is a non-profit corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson River and its ecosystem through enforcement, field work, and community action. Riverkeeper has approximately 3,400 members in the New York region, many of whom use and enjoy the Hudson River and New York Harbor and its tributaries—including the Saw Mill River, the Pocantico River, the Plum Brook, and the Rum Brook—which are polluted by industrial stormwater runoff from the Defendants' Facilities.

12.     Riverkeeper's members use and enjoy the waters that Defendants have unlawfully polluted and are unlawfully polluting.  Riverkeeper's members use those areas to fish, sail, boat, kayak, swim, birdwatch, photograph, engage in spiritual meditation, view wildlife, and engage in nature study and scientific study, among other activities.  Defendants' discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Riverkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA.

13.     For example, one Riverkeeper member resides less than a mile from the Saw Mill River, close to where it meets the Hudson River.  This member frequently walks along both rivers, and often bikes on the North Country Trailway along the Saw Mill and Pocantico Rivers.

During these walks, they engage in birdwatching both alone and with friends. They also occasionally engage in kayaking along the Hudson River. This member actively observes negative impacts to the waterways, as they impact the habitat and aesthetics of the area and are related to their volunteer work for Riverkeeper and other organizations. This member is particularly concerned with algae buildup, the clarity of the water, and noticeable smells in the waterway following storm events. This member is thus harmed by uncontrolled discharges of stormwater from industrial facilities to the Saw Mill River, the Pocantico River, the Hudson River, and their tributaries.

14.     Another Riverkeeper member lives less than a mile from the Pocantico River, near one of Defendant's facilities. This member held a 39-year career in education, and created many hands-on opportunities for their local students to engage and learn about the Hudson River and other nearby waterways. They also volunteer for Riverkeeper, regularly collecting water samples from the Pocantico River for Riverkeeper's water quality program. This member frequently walks and hikes along both rivers on local trails such as those within the Rockefeller State Park Preserve and the Old Croton Aqueduct trail. This member regularly passes one of Defendant's facilities and is concerned about stormwater carrying pollution from that site into the Pocantico River, impacting their ability to recreate and its consequences on public health and the environment. This member is thus also harmed by uncontrolled discharges of stormwater from industrial facilities to the Saw Mill River, the Pocantico River, the Hudson River, and their tributaries.

15.     The relief sought herein will redress the harms to Riverkeeper and its members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Riverkeeper and its members, for which harm they have no plain,

speedy, or adequate remedy at law.

16.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Royal Coach Lines, LLC is a limited liability corporation, incorporated under the laws of the State of New York in 2023, which participates in the ownership and operation of the Facilities. Riverkeeper is informed and believes, and thereupon alleges, that Defendant Royal Coach Lines, LLC has a Principal Executive Office at 1010 Nepperhan Avenue, Yonkers, NY 10703.

17.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Royal Coach Lines, Inc. is a corporation, incorporated under the laws of the State of New York in 1967, which participates in the ownership and operation of the Facilities. Riverkeeper is informed and believes, and thereupon alleges, that Defendant Royal Coach Lines, Inc. has a Principal Executive Office at 1010 Nepperhan Avenue, Yonkers, NY 10703.

18.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Royal Coach Lines, Inc. merged with Defendant Royal Coach Lines, LLC in 2023.

19.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Royal Coach Lines, LLC is the successor in interest of Royal Coach Lines, Inc.

20.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Royal Coach Lines, LLC continues to do business as "Royal Coach Lines, Inc."

**IV.**

**STATUTORY AND REGULATORY BACKGROUND**

**The Clean Water Act**

21.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the

regulation of pollution discharged into the waters of the United States.

22.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  A NPDES permit requires dischargers of pollution to comply with various limitations.

23.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

24.     In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

25.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

26.     The Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A) (i.e., the "BAT" standard).  The Act also sets a

different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants". *Id.* § 1311(b)(2)(E)[1] (i.e., the "BCT" standard) (together, the "BAT/BCT Standard"). *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

27.     The Clean Water Act further requires any NPDES permit issued by a state to contain any additional limits necessary to ensure compliance with that state's water quality standards. *See* 33 U.S.C. § 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards"); *id.* § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

### Stormwater Permits

28.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

29.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

30.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation. In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the

---

[1] "Conventional pollutants" are defined by statute, 33 U.S.C. § 1314(a)(4), and by regulation, 40 C.F.R. § 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

levels discharged by municipal sewage treatment plants. 55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

31.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

32.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

33.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include "storm water runoff, snow melt runoff, and surface runoff and drainage."

34.     40 C.F.R. § 122.26(b)(14)(viii) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") Groups 40–45 (transportation facilities that have vehicle maintenance or equipment cleaning operations, including fueling).  Facilities in these industrial categories must obtain NPDES permit coverage for their stormwater discharges.

### New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

35.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-23-001, N.Y. DEP'T ENVTL. CONSERVATION (Mar. 8, 2023) ("General Permit").  DEC also has the authority to issue SPDES permits for individual applicants.

36.     As a state-issued, delegated NPDES permit, the General Permit requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the BAT/BCT Standard.  *See* General Permit, Part II

(requiring permittees to minimize pollution), *id.*, Appendix A (defining "minimize" as "reduce and/or eliminate to the extent achievable using *control measures* that are technologically available and economically practicable and achievable in the light of best industry practice").

**The General Permit Framework**

37. The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions. All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the CWA's citizen suit provision. 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title").

38. At the outset, the General Permit establishes eligibility conditions that permittees must meet to obtain coverage. General Permit, Part I. Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent. General Permit, Part I.D.

39. Among other things, when submitting a Notice of Intent, the applicant must identify the specific outfalls through which it will discharge industrial stormwater. A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls. General Permit, Parts I.D.3.

40. Other categories of discharges, including but not limited to discharges of process wastewater, sewage, and other non-stormwater discharges, are not eligible for coverage under the General Permit and would require an application for an individual SPDES permit. *See* General Permit, Part I.C.

41. Next, the General Permit contains a variety of substantive limits that all permittees must meet. General Permit, Part II. These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and

compulsory pollution control and minimization practices.  General Permit, Part II.

42.  In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities.  *See* General Permit, Part VII.

43.  The General Permit implements the BAT/BCT standard through a combination of general and sector-specific effluent limitations that require the Facility to "minimize" the discharge of pollutants.  *See* General Permit, Part II; Part VII.  The General Permit defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."  General Permit, Appendix A.

44.  Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).

45.  The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  *See, e.g.*, General Permit, Part II (outlining mandatory BMPs), Part VII (outlining sector-specific BMPs), Part III.A.7 (requiring documentation of all BMPs installed and implemented at the facility pursuant to Parts II and VII, documentation of all innovative BMPs, and an explanation of any BMPs that have not been installed due to site-specific conditions).

46.     The General Permit sets forth additional non-numeric effluent limits requiring particular BMPs based on the type of industrial activities occurring at a particular facility (the "sector").  *See* General Permit, Part VII.

47.     A permittee must record the BMPs and control measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  General Permit, Part III.  The permittee must develop, implement, and continually update this plan to adapt it to changing conditions at the facility.  *Id.*  The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the General Permit.  *Id.* Further the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the General Permit—a fully implemented SWPPP is a precondition of coverage.  General Permit, Part I.D.1.a.

48.     To ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs, permittees must track, improve upon, and report upon their performance under the General Permit.  *See* General Permit, Parts IV–VII.

49.     The General Permit requires regular inspections by qualified personnel, including annual comprehensive inspections and quarterly routine inspections, to evaluate the performance and maintenance needs of BMPs, detect leaks, and document any deficiencies in the implementation and/or adequacy of the SWPPP, amongst other things.  General Permit, Parts IV.A–C; *see also id.* Parts II.A.2–3.

50.     The General Permit also requires monitoring of stormwater discharges, including quarterly visual monitoring and periodic sampling for pollutants associated with the facility's industrial sector.  General Permit, Parts IV.D–G, VII.  The General Permit relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff

concentrations" ("benchmarks") for each pollutant to ensure that permittees are minimizing pollution and complying with the narrative limits set forth in the General Permit. *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

51. A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A (defining "benchmark monitoring cut-off concentrations"). As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995). Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

52. Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements. Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), vacated on other grounds, 485 U.S. 931 (1988).

53. If an inspection or monitoring sample reveals an exceedance, violation, or other issues with the BMPs or the SWPPP, the permittee is required to take and document corrective actions. General Permit, Part V.

54. The results of a permittee's inspections and monitoring must be documented and kept with the SWPPP, and certain reports must be submitted to DEC on a periodic basis.

General Permit, Part VI.  This self-reporting is the primary means by which DEC and EPA ensure a facility complies with the General Permit and the Clean Water Act.

## CWA Citizen Enforcement Suits

55.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

56.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

57.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

58.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

59.     Violators of the Clean Water Act are also subject to an assessment of civil penalties of up to $66,712 per day per violation.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

## Defendants Control the Activities at the Facilities

60.     On information and belief, Defendants own and operate a school bus transportation company and a network of vehicle storage, maintenance, and fueling facilities throughout Westchester County, NY (the "Facilities").  Defendants' Facilities include, but are

not limited to:

    a. 2260 Saw Mill River Road, Elmsford, NY 10523 ("Elmsford Facility");

    b. 870 Nepperhan Avenue, Yonkers, NY 10703 ("870 Nepperhan Facility");

    c. 51 NY-100, Briarcliff Manor, NY 10510 ("Ossining Facility");

    d. 1010 Nepperhan Avenue, Yonkers, NY 10703 ("RC Corporate Facility"); and

    e. 120 Primrose Street, Lincolndale, NY 10540 ("Somers Facility").

61.    Defendants advertise themselves by means of a website, https://www.royalcoachlines.com/, as the owners and/or operators of a "school transportation contractor" business and as the owners and/or operators of the Elmsford Facility, the Ossining Facility, the RC Corporate Facility, and the Somers Facility, amongst others.

62.    Defendants advertise themselves as the owner and/or operator of the Elmsford Facility and the RC Corporate Facility by means of signs posted at those facilities.

63.    Defendants advertise themselves as the owner and/or operator of the Elmsford Facility, the 870 Nepperhan Facility, the Ossining Facility, and the RC Corporate Facility by means of labels on their school buses, which are visibly parked at those facilities.

64.    On information and belief, Defendants have been operating the Elmsford Facility, the Ossining Facility, the RC Corporate Facility, and the Somers Facility since at least 2018.

65.    On information and belief, Defendants have been operating the 870 Nepperhan Facility since at least 2020.

66.    Because Defendants control the activities that take place at the Facilities, Defendants are responsible for managing stormwater associated with industrial activities at the Facilities in compliance with the Clean Water Act.

67.    Defendants are the persons, as defined by CWA Section 502(5), 33 U.S.C.

§ 1362(5), responsible for the violations alleged in this Complaint.

**Defendants' Industrial Activities Expose Pollutants to Stormwater**

68.     On their website, Defendants state that they provide transportation services throughout the tri-state area.

69.     On information and belief, Defendants conduct activities at the Facilities to support those services, including (but not limited to) vehicle and equipment maintenance, fueling, and storage.

70.     On information and belief, Defendants are therefore engaged in industrial activities under SIC Group 41 (local and suburban transit and interurban highway passenger transportation) and/or SIC Group 42 (motor freight transportation and warehousing), all of which are industrial activities included in Sector P of the General Permit.

71.     Defendants have exposed and continue to expose industrial pollutants to stormwater by, at a minimum:

    a.   conducting maintenance and fueling of buses and other vehicles;

    b.   parking vehicles awaiting maintenance outside;

    c.   storing materials and equipment outside or otherwise exposing them to the elements; and

    d.   from vehicles entering and leaving the Facilities that track pollutants off site.

72.     Defendants' industrial activities at the Facilities are conducted outdoors, or are otherwise conducted in roofed areas and/or buildings that are inadequately protective of spilled materials, vehicle track-out, and other pollutant sources coming into contact with stormwater.

73.     Maintenance stations are located at each of the Facilities.  In addition, on their website, Defendants advertise a Bus Mechanic position "working to maintain & repair bus fleet

vehicles."

74.     Outdoor fueling stations and/or above-ground fuel storage tanks are located at the RC Corporate Facility, Ossining Facility, Elmsford Facility, and Somers Facility.

75.     On information and belief, Defendants conduct vehicle cleaning operations at each of the Facilities.  These operations produce process wastewater containing paint, lubricants, oils, fuels, and other pollutants.

76.     On information and belief, Defendants park vehicles awaiting maintenance, fueling, and/or cleaning outdoors at each of the Facilities.

77.     Fluids and staining consistent with the above activities are visible on the pavement at each of the Facilities.

78.     In carrying out the above activities at the Facilities, Defendants engage in storing and handling materials, vehicles, fuel, and equipment in a manner that exposes pollutants to precipitation and snowmelt.

79.     Buses and other vehicles driving on and off the property at the Facilities also track Defendants' industrial pollutants off-site, where they are exposed to stormwater.

80.     On information and belief, in addition to exposing these industrial activities to stormwater, Defendants also fail to adequately contain their process wastewater.  These wastewaters then commingle with stormwater and/or are discharged from the Facility.

81.     Vehicles and industrial equipment at the Facilities expose many pollutants to the elements, including gasoline, diesel fuel, antifreeze, and hydraulic fluids.  These pollution sources also may release fuel, oil, lubricants, PCBs, PAHs, an array of metals, pH-affecting substances, and chemical residues.  These toxic pollutants are often generated in the form of small particulate matter, which settle on the ground and other surfaces that are exposed to

stormwater and non-stormwater flows.

82.      Because Defendants fail to adequately shelter and otherwise contain these pollutant sources to prevent their release to the environment, precipitation falls on and flows over exposed materials, fluids, particulates, and pollutant residues.

83.      All of these pollution sources are thus exposed to precipitation and snowmelt.

## Defendants Discharge Pollution From the Facilities
## Into Waters of the United States

84.      During precipitation events (including runoff from rainfall and snow or ice melt events), exposed pollutants are carried away from the Facilities in stormwater discharges.

85.      On information and belief, polluted stormwater discharges associated with Defendants' industrial activities flow from the Facilities to waters of the United States—namely, the Saw Mill River, the Pocantico River, the Plum Brook, and the Rum Brook—either directly overland or by way of stormwater conveyances, such as catch basins, ditches, and pipes.

86.      Defendants have graded, paved, constructed, and otherwise constructed infrastructure at the Facilities.  On information and belief, due to Defendants' modifications of the Facilities, stormwater is collected and conveyed along gradients across the Facilities and discharged to waters of the United States.

87.      Buses and other vehicles driving off the Facilities also convey Defendants' industrial pollutants off-site, and thus constitute point sources of stormwater pollution in and of themselves.

88.      In addition, each of the Facilities discharge stormwater associated with Defendants' industrial activities through unique point sources specific to that location.  These unique point sources and waterbodies associated with each Facility are described in the following sub-sections.

89.     Polluted industrial stormwater thus flows from the Facilities and discharges to waters of the United States.

90.     On information and belief, Defendants also fail to control process wastewater, including but not limited to washwater, at each of the Facilities. Defendants also discharge this process wastewater from the Facilities via these same conveyances to waters of the United States.

91.     Defendants' industrial activity at the Facilities has caused and continues to cause a "discharge of pollutants" within the meaning of CWA Section 502(12), 33 U.S.C. § 1362(12), and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from each Facility on at least each and every day that there has been a precipitation event greater than 0.1 inches. *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6).

<u>Elmsford Facility</u>

92.     On information and belief, the Elmsford Facility discharges polluted stormwater associated with Defendants' industrial activities to the Rum Brook, a tributary of the Saw Mill River and the Hudson River.

93.     The Elmsford Facility is bordered to the northeast by the Rum Brook, which flows north around the property and then west into the Upper Saw Mill River approximately 900 feet downstream.

94.     In addition to the point sources described above, Riverkeeper alleges that Defendants discharge polluted stormwater from, at a minimum, the following unique point sources at the Elmsford Facility.

95.     A ceramic pipe is located on the northeast side of the Elmsford Facility that discharges to the Rum Brook. On information and belief, stormwater from the Elmsford Facility

flows through the ceramic pipe and discharges to the Rum Brook.

96.    Catch basins (a/k/a storm drains) on the property collect Defendants' industrial stormwater.  On information and belief, the collected stormwater is discharged through subsurface conduits, including but not limited to the ceramic pipe, to the Rum Brook.

97.    A drainage swale is also located on the northeast border of the property, approximately 100 feet south of the ceramic pipe.  On information and belief, stormwater from the Elmsford Facility flows through the drainage swale and discharges to the Rum Brook.

98.    The Rum Brook is a "water of the United States" as defined in 40 C.F.R. § 122.2 and, therefore, a "navigable water" as defined in the CWA Section 402(7).  Additional facts, including details on the classification of and impairments for the Rum Brook and the nearby Upper Saw Mill River, are set forth in the Notice Letter attached to this Complaint as Exhibit A and are incorporated herein by reference.

<u>870 Nepperhan Facility</u>

99.    On information and belief, the 870 Nepperhan Facility discharges polluted stormwater associated with Defendants' industrial activities to the Lower Saw Mill River, a tributary of the Hudson River.

100.    The 870 Nepperhan Facility is directly bordered on its east side by the Saw Mill River and on its west side by Nepperhan Avenue.  The property slopes downward towards the northeast corner, to an area that is bordered on the southeast by the Saw Mill River and to the northeast by River Place.

101.    On information and belief, Nepperhan Avenue has catch basins that are part of the municipal separate storm sewer system ("MS4"), *i.e.*, municipally-owned catch basins that collect and convey stormwater flows without treatment.  Stormwater from Nepperhan Avenue

flows into the MS4 and discharges directly to the Saw Mill River.

102. In addition to the point sources described above, Riverkeeper alleges that Defendants discharge polluted stormwater from, at a minimum, the following unique point sources at the 870 Nepperhan Facility.

103. There is an MS4 catch basin on Nepperhan Avenue immediately adjacent to the 870 Nepperhan Facility's driveway, where vehicles enter and exit the Facility. On information and belief, Defendants discharge industrial stormwater from the 870 Nepperhan Facility via the driveway and the MS4 to the Saw Mill River.

104. There is a gap in the bulwark fence where River Place terminates at the Saw Mill River, near the northeastern corner (and lowest point) of the 870 Nepperhan Facility. On information and belief, Defendants' polluted stormwater from the 870 Nepperhan Facility flows downgrade towards River Place and then discharges directly overland through the gap in the bulwark to the Saw Mill River.

105. The Lower Saw Mill River is a "water of the United States" as defined in 40 C.F.R. § 122.2 and, therefore, a "navigable water" as defined in the CWA Section 402(7). Additional facts, including details on the classification of and impairments for the Lower Saw Mill River, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference.

<u>Ossining Facility</u>

106. On information and belief, the Ossining Facility discharges stormwater associated with Defendants' industrial activities to the Pocantico River, a tributary of the Hudson River.

107. The Ossining Facility is directly bordered on its east side by the Pocantico River. The Ossining Facility grades downwards east towards the Pocantico River, with a low point at

the southeast corner.

108.    In addition to the point sources described above, Riverkeeper alleges that Defendants discharge polluted stormwater from, at a minimum, the following unique point sources at the Ossining Facility.

109.    On information and belief, polluted stormwater from the Ossining Facility flows downgrade to the east, particularly towards the southeast corner, and discharges overland to the Pocantico River.

110.    Catch basins on the property collect Defendants' industrial stormwater.  On information and belief, the collected stormwater is discharged through subsurface conduits to the Pocantico River.

111.    The Pocantico River is a "water of the United States" as defined in 40 C.F.R. § 122.2 and, therefore, a "navigable water" as defined in the CWA Section 402(7).  Additional facts, including detail on the classification of and impairments for the Pocantico River, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference.

RC Corporate Facility

112.    On information and belief, the RC Corporate Facility discharges polluted stormwater associated with Defendants' industrial activities to the Lower Saw Mill River, a tributary of the Hudson River.

113.    The RC Corporate Facility is bordered on its west side by Nepperhan Avenue.  Its eastern side is bordered by the Saw Mill River and an elevated section of the Saw Mill River Parkway, which crosses over the River at that point.

114.    In addition to the point sources described above, Riverkeeper alleges that

Defendants discharge polluted stormwater from, at a minimum, the following unique point sources at the RC Corporate Facility.

115.    Catch basins on the property collect Defendants' industrial stormwater.  On information and belief, the collected stormwater is discharged through subsurface conduits to the Saw Mill River.

116.    The Lower Saw Mill River is a "water of the United States" as defined in 40 C.F.R. § 122.2 and, therefore, a "navigable water" as defined in the CWA Section 402(7). Additional facts, including details on the classification of and impairments for the Lower Saw Mill River, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference.

<u>Somers Facility</u>

117.    On information and belief, the Somers Facility discharges polluted stormwater associated with Defendants' industrial activities to the Plum Brook, a tributary of New Croton Reservoir and the Hudson River.

118.    The Somers Facility is located on a steep gradient above the Plum Brook.  The Somers Facility is approximately 1,000 feet west of the Plum Brook, and there are two unnamed tributaries to the Plum Brook within 200 feet of the Facility to its north and south.  Further west and upgradient from the Somers Facility is a public school.

119.    In addition to the point sources described above, Riverkeeper alleges that Defendants discharge polluted stormwater from, at a minimum, the following unique point sources at the Somers Facility.

120.    Stormwater retention ponds are located east and downgradient of the Somers Facility.  On information and belief, these retention ponds were constructed together with the

public school to the west and were not designed or intended to treat industrial stormwater. Riverkeeper therefore believes and thereupon alleges that Defendants' industrial stormwater is collected in these retention ponds and then discharged without treatment, overland or via the nearby tributaries, to Plum Brook.

121. There are stormwater drains along the access road to the Somers Facility. Immediate access roads to an industrial facility are industrial areas by definition. 40 C.F.R. 122.26(b)(14). The catch basins along the access road collect Defendants' industrial stormwater. On information and belief, the collected stormwater is discharged through subsurface conduits to the Plum Brook or its tributaries, and/or first to the retention ponds and from there to the Plum Brook or its tributaries.

122. The Plum Brook is a "water of the United States" as defined in 40 C.F.R. § 122.2 and, therefore, a "navigable water" as defined in the CWA Section 402(7), as are its tributaries. Additional facts, including details on the classification of and impairments for the Plum Brook are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference.

**Defendants have not Obtained Permit Coverage for These Discharges**

123. Upon information and belief, Defendants are not covered by individual SPDES permits at any of the Facilities.

124. Upon information and belief, Defendants are not covered by the General Permit at any of the Facilities.

125. Upon information and belief, Defendants have not filed Notices of Intent with DEC seeking General Permit coverage for any of the Facilities.

126. Upon information and belief, Defendants have not complied with any provisions

of the General Permit at any of their Facilities.

127.    Accordingly, on December 21, 2023, Riverkeeper sent Defendants via certified mail the Notice Letter described above and attached hereto as Exhibit A.

128.    On information and belief, as of the date of filing of this complaint, Defendants still lack NPDES permit coverage under the General Permit or individual SPDES permits.

129.    Defendants' violations of the Clean Water Act at the Facilities are ongoing and continuous, capable of repetition, and result from the same underlying and unresolved causes.

**VI.**

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Unlawful Discharge of Industrial Stormwater**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

130.    Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

131.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

132.    CWA Section 502(5), 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

133.    CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

134.    CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated

animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

135.    CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

136.    40 C.F.R. § 122.2 defines "waters of the United States" to include, inter alia: (i) "All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide"; (ii) "All interstate waters, including interstate 'wetlands'"; (iii) Tributaries to such waters; (iv) Wetlands adjacent to such waters or their tributaries; and (v) "All other waters . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce."

137.    CWA Section 402(p), 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i), require facilities discharging stormwater associated with industrial activity to obtain a NPDES permit.

138.    Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from point sources at each Facility to waters of the United States without NPDES permits.

139.    Each and every day on which Defendants discharge stormwater associated with industrial activity from each Facility without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

140.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no

plain, speedy, or adequate remedy at law.

141.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**Unlawful Discharge of Industrial Wastewater**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

142.     Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

143.     Defendants have discharged and continue to discharge process wastewater, including but not limited to wastewater from washing vehicles, from point sources at each Facility to waters of the United States without NPDES permits.

144.     Each and every day on which Defendants discharge process wastewater from each Facility without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

145.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

146.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

**Failure to Apply for NPDES Permit Coverage**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

147.     Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

148.     40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit by October 1, 1992.

149.     Since at least December 21, 2018, Defendants have operated and continue to

operate facilities that engages in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

150.    Since that time, Defendants have routinely discharged polluted stormwater associated with industrial activity from the Facilities to waters of the United States.

151.    Therefore, since that time, Defendants have been obligated to apply for coverage under an individual or general NPDES permit for each Facility.

152.    Once Defendants began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendants failed to apply for permit coverage for each Facility constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

153.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

154.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

**Failure to Implement Adequate Control Measures and Best Management Practices
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

155.    Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

156.    The General Permit, Parts II.D and VII, requires Defendants to implement mandatory general and sector-specific control measures and BMPs to minimize the discharge of pollutants from the Facilities.

157.    Because the industrial activities carried out at the Facilities are categorized in SIC Groups 41 and/or 42, Defendants must implement the sector-specific control measures specified in Part VII of the General Permit for Sector P.

158.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not implemented adequate control measures or BMPs required by the General Permit at the Facilities.

159.    The pollution prevention and control measures selected to comply with Parts II.D and VII.P of the General Permit must meet the federal BAT/BCT Standard.

160.    Defendants have failed to implement control measures that meet the BAT/BCT Standard at the Facilities for their discharges of stormwater associated with industrial activity in violation of Parts II and VII of the General Permit.

161.    The failure to implement sufficient BMPs that meet the BAT/BCT Standard is evidenced by, amongst other things, Defendants' unsheltered vehicle maintenance and fueling operations, visible track-out found on Defendants' access roadways, visible staining found on the pavement of the parking areas at the Facilities, and discharges of process wastewater.

162.    On information and belief, Defendants have failed to develop and implement pollution controls equivalent to the BAT/BCT Standard at the Facilities every day since at least December 21, 2018.

163.    Each day upon which Defendants operate each Facility without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION

**Failure to Develop, Implement, and Make Available an
Adequate Storm Water Pollution Prevention Plan
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

164.    Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

165.    The General Permit, Part III, requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

166.    As described in Part III.A.3 of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

167.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

168.    The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VII of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies.  Each of these elements also require the discharger to maintain records and documentation of compliance with each of these elements.

169.    The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

170.    The SWPPP must be signed in accordance with Appendix G.10 of the General Permit and, where the facility is active, retained on-site in accordance with Parts III.A.9 and VI.C.  General Permit, Part III.C.1.

171. The SWPPP must be prepared and must provide for compliance with the terms of the General Permit prior to the date of submission of a Notice of Intent to be covered under the General Permit. General Permit, Part I.D.1.a.1.

172. Because the industrial activities carried out at the Facilities are categorized in SIC Group 41 and/or 42, Defendants must include the sector-specific SWPPP elements specified in Part VII of the General Permit for Sector P, in addition to the SWPPP elements set forth in Part III of the General Permit. General Permit, Part III.A.7.

173. Under Part III.C.2.c. of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within fourteen (14) days of receipt of a written request."

174. Riverkeeper requested a copy of Defendants' SWPPPs for any of the Facilities on December 21, 2018.

175. Defendants have not provided a copy of a SWPPP to Riverkeeper for any of the Facilities.

176. Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not developed SWPPPs for any of the Facilities.

177. Defendants' ongoing failure to develop and implement adequate SWPPPs for any of the Facilities is also evidenced by Defendants' failure to implement adequate control measures and BMPs, as set forth above.

178. Defendants have failed, and continue to fail, to develop, implement, and maintain compliance with and make available adequate SWPPPs for the Facilities as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

179.     Each and every day on which Defendants fail to comply with the General

Permit's SWPPP requirements for each Facility is a separate and distinct violation of CWA

Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and

continuous.

180.     Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no

plain, speedy, or adequate remedy at law.

181.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### SIXTH CAUSE OF ACTION

**Failure to Conduct Routine Site Inspections and Comply with
General Monitoring, Recordkeeping, and Reporting Requirements
(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

182.     Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

183.     The General Permit requires industrial dischargers to conduct and document

comprehensive site inspections at appropriate intervals, but in no event less frequently than once

a year.  The inspection must identify and include all outfalls and sources of pollution, and ensure

that all BMPs are functioning as expected.  General Permit, Part IV.A.1.  Records of this

inspection must be kept for at least five years.  General Permit, Part IV.A.2.

184.     In addition to or alongside the annual comprehensive inspection, industrial

dischargers must also conduct an annual "dry inspection" to ensure there are no non-stormwater

sources being discharged into the stormwater system.  General Permit, Part IV.C.

185.     Qualified personnel must also carry out routine inspections of the facility's

stormwater management practices at least quarterly.  General Permit, Part IV.B.  During these

inspections, personnel must inspect all areas of the facility where industrial materials or activities

are exposed to stormwater, evaluate the performance of stormwater BMPs identified in the

facility's SWPPP, and document any deficiencies in the implementation or adequacy of the BMPs. Such deficiencies must then be addressed through corrective actions under Part V of the General Permit. General Permit, Part IV.B.3.

186. In addition to inspections, all covered facilities must conduct multiple types of analytical monitoring, including quarterly visual inspections of stormwater discharges and sampling and laboratory analysis of outfalls from all qualifying storm events. General Permit, Parts IV.D–F.

187. Further, Defendants engage in industrial activities that fall within Sector P of the General Permit's classifications of industrial activity, and therefore must also conduct additional analysis of water quality samples for a range of pollutant parameters as set forth in Part VII of the General Permit. General Permit, Part IV.F.

188. Records of these monitoring efforts must be maintained for at least five (5) years from the date of the sample, measurement, report, or application. General Permit, Part VI.C.2.

189. Covered facilities are required to report on the results of their monitoring efforts to the DEC, through Annual Certification Reports, Discharge Monitoring Reports, and supplemental reports as necessary. General Permit, Part VI.A–B.

190. Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not conducted any of the site inspections, monitoring, or sampling required by Part IV of the General Permit.

191. Defendants have failed, and continue to fail, to comply with the inspection, monitoring, and sampling requirements of the General Permit.

192.     Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants also have failed to retain records and submit monitoring reports as required by Parts IV and VI of the General Permit.

193.     Each and every day on which Defendants fail to comply with any of the General Permit's inspection, monitoring, recordkeeping, and reporting requirements for each Facility is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

194.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

195.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to the Land Transportation and/or Warehousing Facility Sector (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

196.     Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

197.     The General Permit contains various requirements specific to land transportation and/or warehousing facilities.  General Permit, Part VII.P.

198.     Defendants have failed, and continue to fail, to comply with the requirements of the General Permit that apply to all land transportation and/or warehousing facilities.

199.     To the extent that Defendants' failure to comply with these sector-specific requirements is not captured in the above Causes of Action, such failure is included here.

200.     Each and every day on which Defendants fail to comply with the General Permit's sector-specific requirements applicable to land transportation and/or warehousing

facilities for each Facility is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

201. Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

202. Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### EIGHTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to Facilities that Discharge to an Impaired Waterbody (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

203. Riverkeeper incorporates all preceding paragraphs as if fully set forth herein.

204. Discharges to an impaired waterbody are not eligible for coverage under the General Permit if the cause of impairment is a pollutant of concern included in the "benchmarks" or "effluent limitations" (as those terms are defined in the General Permit) to which the facility is subject, unless the facility:

    a. Prevents all exposure to stormwater of the pollutant(s) for which the waterbody is impaired, and maintains all analysis and documentation supporting such eligibility with the SWPPP;

    b. documents that the pollutant for which the waterbody is impaired is not present on-site, and maintains all analysis and documentation supporting such eligibility with the SWPPP; or

    c. provides additional information in the SWPPP to minimize the pollutant of concern causing the impairment as specified in Part III.D.2 of the General Permit.

General Permit, Part II.C.2.

205.     The Lower Saw Mill River, where the RC Corporate Facility and 870 Nepperhan Facility discharge, is an impaired water.

206.     One of the causes of impairment is excessive oxygen demand (and thus low dissolved oxygen in the water).  Phosphorus, fecal coliform, and chlordane are additional causes of impairment.

207.     Chemical Oxygen Demand is a parameter included in the benchmarks to which Defendants' RC Corporate Facility and 870 Nepperhan Facility are subject under Sector P.

208.     Defendants have not prevented all exposure of substances that create chemical oxygen demand or contribute phosphorus, fecal coliform, and chlordane to stormwater at the RC Corporate Facility and 870 Nepperhan Facility.

209.     Defendants have not documented that such substances are not present onsite at the RC Corporate Facility and 870 Nepperhan Facility.

210.     Defendants have not submitted SWPPPs with the additional information specified in Part III.D.2 of the General Permit for the RC Corporate Facility and 870 Nepperhan Facility.

211.     Defendants have failed, and continue to fail, to comply with the requirements of the General Permit that apply to discharges to impaired waterbodies.

212.     Each and every day on which Defendants violate the General Permit's requirements governing discharges to impaired waterbodies is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342.

213.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

214.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

# VII.

## PRAYER FOR RELIEF

215.     Wherefore, Plaintiff Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.   Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facilities except as authorized by and in compliance with NPDES permits;

c.   Order Defendants to immediately apply for coverage under, and comply fully with all applicable requirements of, the General Permit (or an individual SPDES permit that is at least as stringent) for each Facility;

d.   Order Defendants to take appropriate actions to remediate the harm caused by its violations of the General Permit and the Clean Water Act, to the extent possible;

e.   Order Defendants to pay, jointly and severally, civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

f.   Order Defendants to pay the costs of litigation, including Riverkeeper's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

g.   Award any such other and further relief as this Court may deem appropriate.

**VIII.**

**JURY DEMAND**

Riverkeeper hereby demands a trial by jury of all issues so triable.

Dated this 20th day of February, 2024     Respectfully submitted,

New York, New York

By: _____

Andie Altchiler
Julia Muench

SUPER LAW GROUP, LLC
222 Broadway, 22nd Floor
New York, NY 10038

*Attorneys for Plaintiff Riverkeeper, Inc.*